FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2014 MAR 21 P 4: 39

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL L. AMES, # 408-348

Plaintiff,

v.

ADAMA CAMARA,
SHARLETTE COLLIER,

Defendants.

Civil Action No. JKB-13-777

***

## MEMORANDUM

Michael Ames claims defendants Adama Camara and Sharlette Collier used excessive force against him when he was an inmate at the Jessup Correctional Pre-Release Unit ("JPRU").[1] Ames seeks restoration of good time credits, damages, and other relief. ECF No. 1, 4 and 12. Defendants, by their counsel, have submitted a Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment (ECF No. 22) to which Ames has filed an opposition. (ECF No. 23). Defendants' motion to dismiss will be granted as to Ames' claim of verbal harassment. The remaining claims will be considered after Ames is provided notice of his right to file an opposition response with declarations and other materials in support consonant with the holding in *Roseboro v. Garrison*, 528 F.2d. 309 (4th Cir. 1975).

## BACKGROUND

### A. Ames's Claims

Ames, who is self-represented, brings this action under 42 U.S.C. § 1983. He claims that on January 7, 2013, he was stopped and questioned by Adama Camara and Sharlette Collier, JPRU corrections officers. (ECF No. 1 and 4). Ames asserts that as he was answering the

---

[1] Ames is currently housed at the Eastern Correctional Institution (ECI) in Westover, Maryland. (ECF 22, Exhibit 1 at 1).

questions, Officer Camara became irate. Ames concedes that he walked away. (ECF 4 at 4). Officer Collier became belligerent and hostile. *Id.* Ames was pushed to the ground, kicked, and sprayed with "mace"[2] while Collier stated "die bitch" repeatedly.

According to Ames, Collier was aware Ames has asthma. (ECF No. 1 at 4 and ECF 4.). Ames claims the "mace also made my left eye blind." (ECF No. 1 at 4). Ames alleges he was handcuffed and taken to the medical unit where he labored to breathe from an asthma attack. *Id.* Ames claims that he was treated by JPRU medical staff who determined his vision in his left eye was impaired from "being maced in the eye." (ECF 4 at 4). Ames states he was placed in a special housing unit where he was denied access to the Administrative Remedy Process. (ECF No. 4). Ames, who was later charged with assaulting the officers and lost 100 days of good conduct credits, posits defendants conspired to cover up the incident by issuing disciplinary infractions against him. Ames alleges Camara knew that Ames would "catch a charge" if he violated his probation in Washington, D.C., and would be returned to the federal system. (ECF No. 1 at 4 and ECF 4.).

In his appeal of the hearing officer's decision, Ames claimed that the hearing examiner would not permit him to argue his defense or explain why he was not guilty of the charges. (ECF 22 at 9). Ames states that he was instructed by another officer, Paula Sparks, to report to Housing Unit 3, but she did not issue him a pass.

---

[2] Defendants state pepper spray was applied during the incident. (ECF 22, Exhibits 1 and 2). Pepper spray is a milder irritant and is employed to avoid physical confrontation between prisoners and officers; whereas tear gas [mace] is used primarily as a weapon with greater consequences and requires more thorough decontamination. *See Jackson v. Morgan*, 19 Fed. App'x 97, 102 (4th Cir. 2001). Use of pepper spray, however, is not a trivial event. *See Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) (observing that pepper spray is designed to disable the person sprayed "by causing intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx" (internal quotation marks omitted)), overruled on other grounds by *Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).

2

## B. Defendants' Declarations and Exhibits

### 1. January 7, 2013, Use of Force

Defendants have filed declarations and verified exhibits to support their versions of the events. ECF No. 22.[3] Camara attests in his declaration that on January 7, 2013, he observed Ames leave his assigned housing unit, Housing Unit # 1, and walk towards Housing Unit # 3. (ECF No. 22, Exhibit 2). Camara approached Ames and asked whether he had a pass for Housing Unit # 3, which Ames ignored. Camara gave Ames several direct orders to stop. Ames ignored the orders and continued walking. *Id.* Camara then positioned himself in front of the entrance to Housing Unit # 3 to prevent Ames from entering. Ames pushed Camara in the chest with both hands. Camara pushed back and ordered Ames to turn around for handcuffing. *Id.* Ames then began to strike Camara with a closed fist. *Id.*

Collier responded to the scene, ordering Ames to cease or pepper spray would be applied. After Ames failed to comply, Collier administered pepper spray. Officer Akinwumi Akinwande responded to the officers' call for assistance, and the three officers took Ames to the ground and handcuffed him without further incident. *Id.*

Camara attests that at no time did he or any other staff member kick Ames. *Id.* In his declaration, Camara denies attempting to cover-up the incident or conspire with staff at Eastern Correctional Institution (ECI), where Ames was transferred, to deny Ames access to the Administrative Remedy Procedure (ARP) process. Camara states he had no knowledge regarding a violation of probation in Washington, D.C., that could result in Ames's return to federal prison. *Id.*

---

[3] Ames provided an inmate statement after the incident. ECF 22, Exhibit 4 at 17. The copy filed by defendants is virtually unreadable due to its quality. Defendants will be required to file with the Court a copy of this document that is easily legible.

Officer Collier attests that on January 7, 2013, at approximately 3:00 p.m. she observed Ames push Camara in the chest using both hands, and then strike Camara with a closed fist. (ECF No. 22, Exhibit 3). She responded to the area and ordered Ames to stop or pepper spray would be used. *Id.* After Ames failed to obey her direct order, Collier administered three bursts of pepper spray to Ames's face and chest. *Id.* Collier used her radio to call for additional assistance. Officer Akinwumi Akinwande responded and assisted Collier and Camara with taking Ames to the ground and placing him in handcuffs. Collier attests that she did not scream "die bitch" during the incident nor know that Ames had asthma. *Id.* Collier states that at no time did she or any other staff member kick Ames. *Id.* Collier attests that she did not attempt to cover up the incident, nor did she conspire with Eastern Correctional Institution staff to deny Ames access to the Administrative Remedy Procedure process. *Id; see also* ECF 22, Exhibit 4.

The Serious Incident Report compiled after the incident states that Ames was taken to the medical unit after the incident for evaluation where he was "evaluated and medically cleared." (ECF 22, Exhibit 4 at 3). Ames was issued two infraction notices and placed in a holding room pending transfer. *Id.* Camara and Collier were offered medical evaluation which they declined, and no charges were to be pressed on Ames. *Id.* IIU investigator Detective Ray Wills was notified of the incident, but no case number was assigned. *Id.*

Lt. Evan Ward, ARP Coordinator for ECI, attests that he has not been contacted by Camara and Collier, nor has he contacted them. (ECF 22, Exhibit No. 16). Lt .Ward states further there has been no contact with JPRU staff regarding ARPs at ECI concerning Ames. *Id.*

Ames was transferred to ECI on January 8, 2013, the day after the incident. (ECF 22, Exhibit 1 at 1). On January 8, 2013, Case Manager C. Pridgen prepared a Security Reclassification Instrument recommending an "override" of Ames's security classification.

4

(ECF 22, Exhibit 5). Case management staff disagreed with Ames's security instrument's score-based recommendation, and recommended instead an increase to medium security. The override recommendation was approved by Case Management Supervisor Karen C. Wouldridge on January 8, 2013. *Id.*

## 2. Adjustment Hearing and Investigation

Camara and Collier wrote infractions against Ames after the incident, and on February 7, 2013, Ames pleaded guilty to violating inmate rule #402 (being in or leaving any area or assignment without staff permission). He was found not guilty of violating inmate rule #104 (use of threatening language). (ECF 22, Exhibit No. 6). Ames was found guilty of violating inmate rules #101 (assault or battery on staff), #312 (interfering with or resisting the duties of staff and/or refusing to permit a search), #400 (disobeying a direct lawful order), and #405 (any exhibition, demonstration, or conveyance of insolence, disrespect, or vulgar language). *Id.* Ames received a mandatory suspension of visits for a period of six months for violation of inmate rule #101, and had 100 hours of good conduct credits revoked. *Id.* Additionally, Ames received 120 days of disciplinary segregation for violating rule #101, 45 days concurrent for rule #312, and 30 days concurrent each for violation of rule #400, rule #402, and rule #405. (*Id*; Exhibit No. 7 at 5; Exhibit No. 8).

On February 18, 2013, Ames filed an adjustment appeal (ECF 22, Exhibit 9), which was denied on February 21, 2013, by Assistant Warden Robert Hanke. (ECF 22, Exhibits 6 and 7). Scott S. Oakley, Executive Director of the Inmate Grievance Office (IGO), attests Ames filed one grievance with the IGO. The grievance, IGO No. 20130433, was filed on March 18, 2013, as an "appeal" from a finding that he was guilty regarding an incident that occurred at approximately 3:00 p.m. on January 7, 2013, of inmate rule #101 (assault on staff), #312

5

(interference with staff), and #400 (disobeying a direct order). The grievance was administratively dismissed on May 17, 2013, for failure to respond to a letter sent by the IGO to Ames on April 17, 2013, requesting that he provide within 30 days copies of his disciplinary paperwork as required by COMAR 12.07.01.04(B)(9)(b). *Id* Ames did not subsequently provide the paperwork, and there is no indication in IGO's file of any subsequent circuit court proceeding for judicial review. *Id.*

The incident was not investigated by the Department of Public Safety and Correctional Services' (DPSCS) Internal Investigative Unit (IIU). (ECF No. Exhibit No. 10). Although the IIU was notified of an incident on January 7, 2013, no IIU case number was assigned nor was an IIU investigation completed. *Id.* Jesse Ballard III, Director of the IIU, on May 11, 2013, indicates:

> Due to the information provided by the facility at the time of reporting, it was determined that inmate Michael Ames attempted unauthorized entry into the housing unit and shoved COI Adama Camari [sic] when CO I Camari [sic] confronted Inmate Ames. A spontaneous use of force was used by COII Sharlette Collier in the form of OC Spray. The institution reported that there were no injuries to anyone involved and they also reported that COI Camari [sic] did not wish to pursue criminal charges. Based on the facts that were portrayed to the Duty Officer a case number was not assigned by the Internal Investigative Unit for this incident.

(ECF 22, Exhibit 10).

### 3. Medical Records

Ames's medical records, as filed by defendants, confirm his history of asthma and impaired vision. (ECF 22, Exhibit 11 at 6-7, 12-15). Ames first presented complaints of vision loss "since being maced at JPRU" on January 25, 2013. *Id.* at 53. He continued to present complaints about his vision at later medical visits, *id.* at 12-15, 55, 57, and was referred by medical providers for an optometry evaluation. *Id.* at 53-54. The January 7, 2013, medical record

of his evaluation after the incident states he was alert and no injuries were observed. Ames's vital signs were normal and no pain was reported or lacerations observed.

## STANDARD OF REVIEW

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). The Court in *Twombly* articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678. First, while a court must accept as true all the factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)).

Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Id.* at 679. Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. In making this assessment, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Iqbal*, 556 U.S. at 679. "At bottom, a plaintiff must nudge [its] claims across the line from conceivable to plausible to resist dismissal." *Wag More Dogs, LLC*, 680 F.3d at 365 (internal quotation marks omitted).

## DISCUSSION

"[N]ot all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (4th Cir.1995). Verbal abuse of inmates by guards, including aggravating language, without more, states no constitutional claim. *See Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (sheriff laughed at inmate and threatened to hang him); *Blades v. Schuetzle*, 302 F.3d 801, 805 (8th Cir. 2002) (racial slurs); *Cole v. Cole*, 633 F.2d 1083, 1091 (4th Cir. 1980) (no harm alleged from claimed verbal harassment and abuse by police officer). Further, verbal harassment is not actionable under § 1983. *See Barney v. Pulsipher*, 143 F.3d 1299, 1310 n.11 (10th Cir. 1998); *accord Shabazz v. Pico*, 994 F.Supp. 460, 474 (S.D.N.Y.1998); *see also McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir.1993); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987); *Partee v. Cook County Sheriff's Office*, 863 F.Supp. 778, 781 (N.D. Ill.1994) (inmate's "allegations of verbal threats, racial epithets, and continued harassment" failed to meet objective component of Eighth Amendment).

Ames claims that Officer Collier repeatedly shouted "die bitch" as she administered pepper spray, while knowing that he suffered from asthma. Such a statement, if uttered, while

8

heinous and highly unprofessional, fails to amount to a claim of constitutional magnitude under these facts.

## CONCLUSION

Ames's claim of verbal harassment will be dismissed. Plaintiff is granted seventeen days to file an opposition response consonant with the holding in *Roseboro v. Garrison.* A separate order follows.

DATED this 21 day of March, 2013.

BY THE COURT:

James K. Bredar
United States District Judge