# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MICHAEL L. AMES, # 408-348      *

     *

Plaintiff,      *

     *

v.      *      Civil Action No.  JKB-13-777

     *

ADAMA CAMARA,      *

SHARLETTE COLLIER,      *

     *

Defendants.      *

     ***

## MEMORANDUM

Michael Ames ("Ames") is suing defendants Adama Camara and Sharlette Collier under 42 U.S.C. § 1983 ("Camara" and "Collier," respectively) for alleged physical assault. On May 15, 2013, Ames filed a Motion to Amend the Complaint and submitted the declaration of a fellow inmate who had witnessed the incident (ECF No. 12), which was granted on June 26, 2013. (ECF No. 16). Defendants, by their counsel, filed a motion to dismiss, or, in the alternative, motion for summary judgment (ECF No. 22) to which Ames has filed an opposition (ECF No. 23).

On March 21, 2014, the court dismissed plaintiff's claim of verbal harassment and, consonant with *Roseboro v. Garrison*, 528 F.2d. 309 (4th Cir. 1975), granted Ames additional time to reply with declarations and other materials as to his remaining claims. (ECF No. 24-26). Ames submitted correspondence in reply without exhibits.  (ECF No. 27).

The case is ripe for disposition. After considering the pleadings, exhibits, and applicable law, the court now rules pursuant to Local Rule 105.6 (D. Md. 2014), as a hearing is deemed

unnecessary. For reasons to follow, defendants' motion for summary judgment (ECF No. 22) will be GRANTED.

## BACKGROUND

Ames is a self-represented Maryland inmate who is presently incarcerated at Eastern Correctional Institution ("ECI"). He claims that on January 7, 2012, he was subjected to excessive use of force at the Jessup Correctional Pre-Release Unit ("JPRU"). He states Defendants' use of "mace also made my left eye blind." (ECF No. 1, p. 4). Additionally, he asserts that defendants conspired to cover up the incident by writing infractions against him, and asserts Camara knew that if Ames received an infraction, Ames would violate his District of Columbia probation and be committed back to the federal prison system.[1] He further contends that Collier was aware that Ames suffered from asthma, and he was transferred from JPRU to "thwart the judicial process by way of denying and/ or ignoring the ARP process." (ECF No. 1, 4 and 12). Ames seeks restoration of good time credits, damages, and other relief. *Id.*

### A. Plaintiff's Claims

Ames alleges that on January 7, 2013, he was stopped and questioned by JPRU corrections officers Adama Camara and Sharlette Collier. (ECF No. 1 and 4). Ames asserts that as he was answering the questions, Camara became irate. Ames acknowledges that he walked away from the officer. (ECF No. 4, p. 4). Ames states Collier then became belligerent and hostile. *Id.*[2] Ames states that he was pushed to the ground, kicked, and sprayed with "mace" while Collier stated "die bitch" repeatedly. *Id.* Ames claims Collier was aware Ames has asthma. (ECF No. 1, p. 4, and ECF 4.). Ames avers the "mace also made my left eye blind." (ECF No. 1,

---

[1] Ames alleges Camara knew that he would "catch a charge" if he violated his probation in Washington, D.C., and would be returned to the federal system. (ECF No. 1, p. 4, and ECF 4.).

[2] Ames does not particularize the officers' statements or actions in this regard.

p. 4). Ames states he was handcuffed after the incident and taken to the medical unit where he labored to breathe from an asthma attack.  He states JPRU medical staff determined the vision in his left eye was impaired from "being maced in the eye." (ECF 4, p. 4).

Ames was transferred to ECI the following day. (ECF 22, Exhibit 1 at 1).  Ames claims that he was placed in a special housing unit at ECI where he was denied access to Administrative Remedy Process ("ARP") forms. (ECF No. 4, ECF No. 23, p. 2). Ames, who was later charged with assaulting the officers and lost 100 days of good conduct credits,[3] posits defendants conspired to cover up the incident by issuing disciplinary infractions against him.

On May 15, 2013, Ames filed a declaration from inmate Brandon Van Orden, #366-055 (ECF No. 12).  Van Orden's declaration reads in part that at JPRU on January 7, 2013, at approximately 2:30 p.m., he:

> [w]alked into the hallway of housing unit # 3 heading out as I came around the corner and seen[sic] officer Adama Camara aggressively shoving Inmate Michael Ames DOC #  408348 against the outside door of Housing Unit 3, when Officer Sharlette Collier came up and began to mace Inmate Michael Ames, DOC # 408348.  The officer was yelling I hope you die, die bitch.  Inmate Michael Ames DOC # 408 was not resisting or being combative.  I was standing around the corner so the officers could not see me, but I could see them both.

*Id.*[4]

### B.  Defendants' Response

#### 1.  Camara Declaration

Camara attests that on January 7, 2013, he observed Ames leave his assigned housing unit and walk toward Housing Unit Three (ECF No. 22, Exhibit 2, ¶ 2).  Camara approached Ames and asked whether he had a pass to go to Housing Unit 3. Ames ignored Camara's

---

[3]   Good conduct credits are deducted "in advance" from the inmate's term of confinement. *See* Md. Code, § 3–704(a) of the Correctional Services Article.

[4]   Van Orden was not a witness at Ames's disciplinary adjustment hearing concerning the incident.  (ECF No. 22, Exhibit 7.)

question and kept walking toward Housing Unit 3. Camara gave Ames several direct orders to stop but Ames did not comply. *Id.*

Camara then positioned himself in front of Ames to prevent him from entering Housing Unit 3. Ames pushed Camara in the chest with both hands and began to strike Camara with a closed fist. *Id.* Collier responded to the scene and gave Ames a direct order to cease or pepper spray would be applied.  When Ames did not comply, Collier administered pepper spray. Officer Akinwumi Akinwande responded to the officers' call for assistance, and the three officers took Ames to the ground and handcuffed him without further incident. *Id.*

Camara attests that "at no time did I, or any other staff member, kick [Ames]." *Id.* ¶ 6. Camara states at no time did he attempt to cover up the incident or conspire with staff at ECI to deny Ames access to the ARP process. *Id.* Camara states he had no knowledge that if Ames received an infraction he would violate his District of Columbia probation and be committed back to federal prison. *Id.* ¶ 5

### 2.  Collier Declaration

Collier attests that on January 7, 2013, at approximately 3:00 p.m., she observed Ames push Camara in the chest with both hands and then strike him with a closed fist. (ECF No. 22, Exhibit 3, ¶ 3).  Collier ordered Ames to stop or pepper spray would be used.  *Id.*   After Ames failed to comply, Collier administered three burst of pepper spray to Ames's face and chest. *Id.* Collier used her radio to call for additional assistance. Officer Akinwumi Akinwande responded and assisted Collier and Camara with taking Ames to the ground and placing him in handcuffs.

Collier attests that she did not scream "die bitch," nor did she know that Ames had asthma. *Id.*, ¶ 5.  She attests that neither she nor any other staff member kicked Ames, that she

did not attempt to cover up the incident, and that she did not conspire with ECI staff to deny

Ames access to the ARP process. *Id.*, ¶¶ 4 and 6.

### 3. Serious Incident Report

Camara's sworn statement in the Serious Incident Report reads:

> Approximately at 1500 hours, I, Officer Camara A., observed inmate Michael Ames DOC 408348 bunk B 73 leaving the yard to Hous[ing] Unit 3. I asked him if he had a pass to go to Hous[ing] Unit 3, and he ignored me and kept going to Hous[ing] Unit 3.  I gave couple of direct orders to inmate Michael Ames to stop going to Hous[ing] Unit 3; however, he ignored me again.  I went and stopped in front of Hous[ing] Unit 3's door 1 to prevent inmate Michael Ames from getting into the unit. Inmate Michael Ames pushed me in my chest with both of his fists.   I pushed him back, and told him to turn round to be handcuffed; inmate Michael Ames refused and kept fighting me. Officer Collier told him to stop fighting or she would spray him with mace.  Inmate Michael Ames ignored Officer Collier's direct order, and she sprayed the mace on his face and then called for assistance.

(ECF No. 22, Exhibit 4, p. 5).

Ames's January 7, 2013, Inmate Statement in the Serious Incident Report reads:

> I walk up to Housing Unit 3. CO Collier and CO Camara told me Bitch you better stop going to Housing Unit # 3.  I stop and said I a [sic] man not your child my family is home and then keep on walking … [illegible] into a [sic] inmate in Housing 3 which Camara push me [sic] and I hit my back on the door and push him off me then CO Collier mace me 4 times and said Bitch die so now I want to file a civil suit ….

(ECF No. 22, Exhibit 4, p. 17, ECF No. 28).[5]

Ames was taken to the medical unit for evaluation where he was "evaluated and

medically cleared" by Nwoju Chizobe, R.N. (ECF 22, Exhibit 4 pp. 3 and 18).[6] The January 7,

2013, medical record of his evaluation after the incident states he was alert, no injuries or

---

[5]   Portions of the Inmate Statement are illegible. Counsel for Defendants has advised the court that efforts to improve the quality of the copy by using various technology processes were unsuccessful. (ECF No. 28).

[6]  Ames states he was treated in the JPRU by "RN. Mr. Jay and Nurse Ashely, it was determined at that time that [Ames] suffered damage to the left eye that has impaired the vision in that eye from being maced in the eye." (ECF No. 4, p. 4).

lacerations were observed, vital signs were normal, and no pain was reported. (ECF No. 22, p.

18).  Camara and Collier declined medical evaluations. No criminal charges were pressed against

Ames.  *Id.*

Ames was issued two infraction notices and placed in a holding room pending transfer.

*Id.* pp. 4-6.  Internal Investigation Unit ("IIU") investigator Detective Ray Wills was notified of

the incident, but no case number was assigned. *Id.* Jesse Ballard III, Director of the IIU, on

May 11, 2013, states:

> Due to the information provided by the facility at the time of reporting, it was
> determined that inmate Michael Ames attempted unauthorized entry into the
> housing unit and shoved COI Adama Camari [sic] when CO Camari [sic]
> confronted Inmate Ames.  A spontaneous use of force was used by COII Sharlette
> Collier in the form of OC Spray. The institution reported that there were no
> injuries to anyone involved and they also reported that COI Camari [sic] did not
> wish to pursue criminal charges.  Based on the facts that were portrayed to the
> Duty Officer a case number was not assigned by the Internal Investigative Unit
> for this incident.

(ECF 22, Exhibit 10).

### 4.  Ward Declaration

Lt. Evan Ward, ARP Coordinator for ECI, attests that he has not been contacted by

Camara and Collier, nor has he contacted them. (ECF 22, Exhibit No. 16).  Lt. Ward states there

has been no contact with JPRU staff regarding ARPs at ECI concerning Ames. *Id.* (ECF 22,

Exhibit 1 at 1).

On January 8, 2013, Case Manager C. Pridgen prepared a Security Reclassification

Instrument recommending an "override" of Ames's security classification based on the incident

and recommended increasing his status to medium security. (ECF 22, Exhibit 5, p. 2). The

recommendation was approved by Case Management Supervisor Karen C. Wouldridge on

January 8, 2013. *Id.*

### 5.  Adjustment Hearing and Investigation

On February 7, 2013, Ames appeared at his adjustment hearing.  Ames's presentation was summarized in the hearing examiner's decision in pertinent part as follows:

> Affirmation on the day of the incident the PO called my mother and told her I shouldn't be in jail. Lt. Sparks told me to go see my case manager.  I went to see the case manager the CO pushed me and I threw my hands up and like what's going on the CO came and mace [sic] me and said die bitch.

(ECF No. 22, Exhibit 6, p. 4).

Ames pleaded guilty to violating inmate rule violation #402 (being in or leaving any area or assignment without staff permission). The hearing officer found the evidence (staff reports and hearing testimony) offered against him credible and found him guilty of violating inmate rules #101 (assault or battery on staff), #312 (interfering with or resisting the duties of staff and/or refusing to permit a search), #400 (disobeying a direct lawful order) and #405 (any exhibition, demonstration, or conveyance of insolence, disrespect, or vulgar language). *Id*. pp. 4-5.  Ames received a mandatory suspension of visits for a period of six months for violation of inmate rule #101 and had 100 hours of good conduct credits revoked. *Id*. Additionally, he received 120 days of disciplinary segregation for violating rule #101, 45 days concurrent for rule #312, and 30 days concurrent each for violation of rule #400, rule #402, and rule #405. (*Id*; Exhibit No. 6, p. 5; Exhibit No. 8). Ames's appeal was denied on February 21, 2013, by Assistant Warden Robert Hanke. (ECF 22, Exhibits 6, 7, and 9).

Ames filed a grievance with the Inmate Grievance Office (IGO) after his appeal was denied. The grievance was administratively dismissed on May 17, 2013, for failure to respond to a letter sent by the IGO to Ames on April 17, 2013, requesting that he provide within 30 days copies of his disciplinary paperwork. *Id*   Ames did not provide the additional paperwork, and

there is no indication in IGO's file of any subsequent circuit court proceeding for judicial review. *Id.*

### 6. Medical Records

Ames's medical records, as filed by defendants, demonstrate that he has a history of asthma and impaired vision. (ECF 22, Exhibit 11, p. 6-7).  No serious disability or injury to his left eye is indicated. *Id*. pp. 4, 7-8. A medical record review completed on January 9, 2013, two days after the incident at JPRU, noted no signs of abuse or trauma. *Id*. p. 46. On January 10, 2013, Ames was seen by medical providers for possible shingles and the medical record reads that he was in no apparent distress. *Id*. p. 47-48.

Ames first presented complaints of vision loss in his left eye on January 25, 2013, in a sick call request slip that sought treatment for "when I got mace [sic] in JPRU my left eye lost it [sic] visional [sic] I need somebody to give me some type of treatment so I can get my vision back." *Id*. p. 15.[7]  He presented complaints about his vision on March 6, 2013, April 20, 2013, and May 7, 2013.  (*Id.* pp. 12-15, 53-54, 57).

On January 31, 2013, Ames was examined for complaints concerning vision in his left eye. (ECF No. 22, Exhibit 11, p. 55).  The record reads that review of the medical chart showed Ames's "eye exam-normal at that time-no ulcerations noted." *(Id*., Exhibit 11, p. 55).  Ames was referred to optometry for further consideration. *Id*.  Medical providers referred Ames to optometry again on March 16, 2013.  (ECF No. 22, Exhibit 11, p. 57).  Ames's medical chart for April 12, 2013, reads "Michael Ames was a no show for there [sic] apt. today."  (ECF No. 22,

---

[7]   Ames does not allege that he has received inadequate medical treatment for his vision complaints.

Exhibit 11, p 63). The chart indicates "[u]nable to do eye exam, IM on staff alert, will reschedule." *Id*.[8]

On May 1, 2013, Ames was provided an eye examination. (ECF No. 22, p. 17). The reason for his examination was listed as "want[s] new glasses" and "blurry near vision." *Id*. On May 20, 2013, Ames received a new pair of eyeglasses. *Id*. p. 4.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *See Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id*. at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal

---

[8]   On April 3, 2013, Ames was placed on staff alert. He subsequently pleaded guilty to assault or battery on staff, assault or battery on an inmate, and related infractions. (ECF No. 22, Exhibit 13, p. 2, Exhibit 17, pp. 1-7).

knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Rule 56(c)(4).

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nevertheless, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation*, 477 U.S. at 323–24).

## DISCUSSION

### A. Excessive Force Claim

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam); *Hudson v. McMillan*, 503 U.S. 1, 7–9 (1992).  Eighth Amendment analysis asks whether the prison officials "acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).

In a claim for excessive application of force, a claimant must meet a heavy burden to satisfy the subjective component—that correctional officers applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good-faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). To satisfy

the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

In determining whether prison officials have acted maliciously and sadistically, a court should balance 1) the need for the application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the responsible officials, and; 4) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321. Not every malevolent touch by a prison guard, later determined in the calm of a judge's chambers to be gratuitous, gives rise to a federal cause of action. *See Hudson*, 503 U.S. 1, 6 (1992). In *Wilkins*, the Supreme Court stated: "This is not to say the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." 559 U.S. at 37 (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). But, it is a factor in applying and reviewing the Eighth Amendment analysis. *Id*. Thus, a court must look at "the nature of the force rather than the extent of the injury." *Wilkins*, 559 U.S. at 34.

Prison officials are charged with balancing competing governmental interests, such as the maintenance of order; protection of correctional officers, prison staff, and other inmates; and inmates' rights to be free from cruel and unusual punishment. *See Whitley*, 475 U.S. at 321. When correctional officers use force to keep order, they have little time for considered reflection and must quickly and decisively balance the need to maintain order and restore discipline through force against the risk of injury to inmates. *See Hudson*, 503 U.S. at 6. Thus, in excessive force cases, the subjective component is measured by the same standard as the objective: "whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id*. at 7.

More specific to this case, "'[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical agents in quantities greater than necessary or for the sole purpose of inflicting pain.'" *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir.1996)) (emphasis omitted). However, pepper spray is not "per se a cruel and unusual punishment," *McCargo v. Mister*, 462 F. Supp. 813, 818 (D. Md. 1978), and can be used to "control a recalcitrant inmate" without violating the Eighth Amendment. *Williams*, 77 F.3d at 763.

Ames acknowledges that he walked away from Camara when asked to present his pass. *See supra* pp. 2 and 5. In doing so, Ames threatened institutional security not only by violating Camara's direct orders, but by proceeding without permission toward an unauthorized area. Ames escalated the incident by ignoring Camara's subsequent direct orders to halt. The threat accelerated when Ames pushed and then punched Camara who tried to block Ames from entering the unauthorized Housing Unit. Notably, Ames does not deny punching or pushing Camara. (ECF No. 1, 4, and 28). Ames was ordered to desist and warned that pepper spray would be used if he did not comply. Despite the warning, Ames did not comply and three bursts of pepper spray were administered. Ames was taken to the ground, and handcuffed.  (ECF No. 22, Exhibit No. 2 and 3).  As previous discussed, Collier attests she did not know that Ames suffered from asthma.  Aside from his unsupported assertion otherwise, Ames provides nothing to substantiate his claim that Collier was aware he was asthmatic or acted maliciously and sadistically toward him in this regard.

Ames's submission of fellow inmate Van Orden's declaration does not refute these facts because Van Orden observed only a portion of the incident. Although Van Orden may have observed the officers' efforts to gain control of Ames, his declaration is silent as to the genesis of

the incident, *i.e.*, Ames's refusal to comply with orders, his movements toward an unauthorized area, or his initial physical assault of Camara.  Van Orden does not attest to observing the officers kicking Ames. (ECF No. 22).

Under these circumstances, concerns of institutional security necessitated the application of force because Ames was proceeding toward an unauthorized area and assaulted a correctional guard.  The force was tempered in that Ames was given an opportunity to comply with lawful orders, and the administration of pepper spray was measured and brief. Once Ames was handcuffed, he was taken for a medical evaluation without further reported incident. In sum, the force was appropriate to restore order, to maintain institutional security, and to protect the safety of the officers as well as Ames.  In light of the foregoing, Ames does not satisfy his burden to show the correctional officers applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good-faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted).  Ames's reply to defendants' motion fails to create a "genuine" issue of "material" fact because he does not materially contradict the verified records offered by defendants or provide evidence of a character "such that a reasonable jury could return a verdict" in his favor. *Anderson*, 477 U.S. at 248. Accordingly, defendants are entitled to summary judgment as a matter of law as to this claim.

### B.  Claims of "Cover-up"

Next, Ames alleges that defendants acted to "cover-up" the incident by writing infractions against him. Plaintiff claims Camara knew that if plaintiff received an infraction, he would violate probation in Washington, D.C., and be committed back to the federal prison system. Ames presents no allegation of fact in support of these claims.  His claims are devoid of

substantiation and are directly refuted by defendants' declarations.[9] Ames fails to set out specific facts showing a genuine dispute for trial, and thus, summary judgment will be entered in favor of defendants as to these claims.

### C. Disciplinary Hearing

Insofar as Ames may be seeking the restoration of his good conduct credits on the grounds that his disciplinary hearing violated due process, his claim is unavailing. Inmates retain rights under the Due Process Clause, but prison disciplinary proceedings are not part of a criminal prosecution and the full array of rights due a defendant in the latter proceedings does not apply. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citing *Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)). Although prisoners "may not be deprived of life, liberty or property without due process of law," their due process rights remain "subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." *Wolff*, 418 U.S. at 556. Accordingly, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id*.

In disciplinary proceedings where an inmate faces the possible loss of good conduct credits, certain due process protections attach, including (1) advance written notice of the charges against him; (2) a hearing where the inmate is afforded the right to call witnesses and present evidence, so long as doing so is not "unduly hazardous to institutional safety or correctional goals"; (3) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (4) an impartial decision-maker and a written statement of the evidence relied on and the reasons for taking any disciplinary action. *Id*. at 564–71. If the hearing officer's decision contains a written statement of the

---

[9] Ames has not met his burden to demonstrate a constitutional claim of excessive force, and his claim of a "cover-up" based on the January 7, 2013, incident does not state a claim of constitutional magnitude.

evidence relied upon, procedural due process is satisfied. *See Baxter v. Palmigiano*, 425 U.S. 308, 323 n.5 (1976).

In the prison context, a liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Substantive due process is satisfied so long as the disciplinary hearing decision is based upon "some evidence." *Superintendent, Mass. Correctional Institution v. Hill*, 472 U.S. 445, 455 (1985). A disciplinary hearing officer's findings of fact will be disturbed only when unsupported by any evidence, or when wholly arbitrary and capricious. *Id.* at 456; *see also Baker v. Lyles*, 904 F.2d 925, 933 (4th Cir. 1990).

The undisputed exhibits show Ames was given advanced, written notice of the charges and an opportunity to call witnesses, to present evidence, and to have representation. Ames was provided a written statement of the evidence relied on by the Hearing Officer. (ECF No. 22, Exhibits 4, 6.) The Hearing Officer's decision was based on staff reports and credited testimony. (ECF No. 22, Exhibit 6, pp. 4-6). Accordingly, due process was satisfied and summary judgment will be entered in favor of defendants as to this claim.

### D. Denial Of Access To Administrative Remedies Claim

Ames claims he was transferred to ECI where he was placed in special housing confinement and subjected to atypical and significant hardship because he was denied access to the ARP process. (ECF No. 4, p. 4). He also asserts that he was transferred to "thwart the judicial process by way of denying and/or ignoring the ARP procedure." *Id.* Defendants' verified exhibits directly refute these claims. Ames provides no declarations or other verified exhibits to demonstrate a genuine issue of material fact in this regard. It bears noting, too, that

Ames's transfer to ECI from JPRU was consistent with the increase in his security classification after the incident.

Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 821 (1977). The right is not without limits. The Supreme Court stated in *Lewis v. Casey*, 518 U.S. 343, 355 (1996):

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355). Actual injury occurs when a prisoner demonstrates that a "non-frivolous" and "arguable" claim was lost because of the denial of access to the courts. *Lewis*, 518 U.S. at 352–52. "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Id.* at 349.

A prisoner claiming he was denied access to the courts must ultimately prove he suffered an actual injury by showing that the defendant's acts hindered his ability to pursue a non-frivolous legal claim. Conclusional allegations are not sufficient. *See Wardell v. Duncan*, 470 F.3d 954, 959 (10th Cir. 2006) (denying access to court claim based on allegation that petition for a writ of certiorari had, for unspecified reasons, been dismissed and where plaintiff did not

even mention the point on appeal).  The right of access to the courts is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Here, Ames provides no facts or evidence to show that he suffered any harm as a result of the actions alleged.  Simply put, his general allegations are insufficient to state a claim of denial of access to the courts.  Further, the Constitution creates no entitlement to grievance procedures or access to such procedures voluntarily established by a state.  *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).   Consequently, summary judgment will be entered in favor of defendants as to this claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment will be granted. Judgment will be entered in favor of defendants and this case will be closed by order to follow.

June 30, 2014____                                           /s/_____
Date                                                 James K. Bredar
                                                United States District Judge